NOT FOR PUBLICATION                                    [Docket No. 112]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| DAVE DONACHY, et al.,<br><br>    Plaintiffs,<br><br>        v.<br><br>PLAYGROUND DESTINATION PROPERTIES, INC.<br><br>    Defendant. | Civil No. 1:10-cv-04038<br><br>(RMB/KMW)<br><br>**OPINION** |

Appearances:

Benjamin F. Johns, Esquire
Joseph G. Sauder, Esquire
Chimicles & Tikellis, LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, Pennsylvania 19041
    Attorneys for Plaintiffs

Aaron Van Nostrand, Esquire
Cory M. Gray, Esquire
Greenberg Traurig LLP
200 Park Avenue
Florham Park, New Jersey 07932-0677
    Attorneys for Defendant

**BUMB,** UNITED STATES DISTRICT JUDGE:

**I.   Introduction**

This matter comes before the Court upon a motion by Defendant, Playground Destination Properties, Inc. ("Playground"), for summary judgment under Federal Rule of Civil Procedure 56(a). [Docket No. 112].  Pursuant to prior Opinions

1

by this Court, [Docket Nos. 24, 60 & 100], the only remaining claims in this case are asserted pursuant to the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 et seq., ("NJCFA") by the remaining Plaintiffs, Dave Donachy, Carol Donachy, Anthony DiMeglio, Susan DiMeglio,[1] Andrew Wingfield, Charlene Wingfield, Richard Kucharski and Suzanne Kurcharski (the "Plaintiffs"). For the reasons set forth below, Defendant's motion shall be denied.

## II. Factual Background[2]

In 2002, Cherokee Ltd., ("Cherokee") began to develop the Veranda resort in Turks and Caicos. (Def.'s Statement of Material Facts ("DSOF") and Pls.' Resp. to Def.'s Statement of Facts ("PRSOF") at ¶ 1). In approximately July 2002, Playground entered into an Exclusive Listing and Marketing Agreement with Cherokee providing that Playground would market Veranda for Cherokee. (DSOF & PRSOF at ¶2).

### A. The Donachys

Plaintiffs Dave and Carol Donachy looked at real estate in Turks and Caicos after they attended a wedding on the island in July 2004. (DSOF and PRSPF at ¶ 3). The Donachys began to

---

[1] Defendant does not move for summary judgment with respect to the NJCFA claims of either Anthony or Susan Dimeglio.
[2] Where there are significant factual disputes between the parties, the facts should be construed in favor of the non-moving party. See Kopec v. Tate, 361 F.3d 772, 775 (3d Cir. 2004), cert. denied, 543 U.S. 956 (2004).

2

communicate about the Veranda with an employee of Playground named Taz Brown ("Brown"). (Id.). The parties agree that during those communications, Brown represented that any deposit submitted by Mr. Donachy would be "safe" and that the transaction was a "no-brainer." (Id. at ¶ 4). The Donachys aver that Brown further represented to Mr. Donachy that a deposit submitted for the Veranda would be safe under "any and all circumstances," and "no matter what." (PRSOF at ¶ 4). Mr. Donachy understood Brown's representations to mean that the Donachys would not lose their deposit even if Cherokee went bankrupt. (Pls.' Statement of Material Fact ("PSOF") at ¶¶ 3-4). Defendant disputes that any such representations were made by Brown and further asserts that Mr. Donachy's assertions are uncorroborated, self-serving statements.

Brown was the only person the Donachys spoke to from Playground before they signed an Offer and Purchase Agreement for a unit at the Veranda.[3] (DSOF & PRSOF at ¶¶ 5-6). The

---

[3] The Purchase Agreement provides, in relevant part:

> 5.2 All payments made by the Purchaser may be utilized by the Seller for the purpose of financing the Development including the cost of design, sales and marketing
> 5.3 The Deposit received from the Purchaser shall be held by the Seller's Attorneys and only released to meet costs related to the Development.

(PRSOF at ¶ 5).

3

Donachys aver that, based on Brown's representations, they submitted a $70,180 deposit (PSOF at ¶ 5). In 2008, the Donachys learned that their deposit would not be returned because Cherokee, who had used the deposit money for construction, had gone bankrupt. (PSOF & Def's Resp. SOF ("DRSOF") at ¶ 6).

    B.    The Kucharskis and Wingfields

Plaintiffs Richard and Suzanne Kucharski were visiting Turks and Caicos in the spring of 2004 when they allegedly observed an advertisement for the Veranda in a magazine. (DSOF & PRSOF at ¶ 7). After returning home, Mr. Kucharski emailed Playground about the Veranda using an email address that he saw on the magazine advertisement. (Id. at ¶ 8). Brown responded to Mr. Kucharski's email, and the two of them discussed the Veranda, but Mr. Kucharski did not purchase a unit at that time. (Id.). In those discussions, Brown allegedly stated that the twenty percent deposit required to purchase a unit would be safe in "all circumstances." (PRSOF at ¶ 9). Defendant avers that there is nothing to corroborate Mr. Kucharski's testimony on this point.

Later in 2004, Mr. Kucharski and a friend returned to Turks and Caicos to research potential real estate acquisitions, including the Veranda, which they were shown by an independent agent named Robert Mueller, unaffiliated with Playground. (DSOF

4

& PRSPF at ¶ 9). While visiting the Veranda, Mr. Kucharski allegedly met a second independent agent unaffiliated with Playground, Karen Biker, who gave them an informational brochure, which stated, in part:

> It is very interesting to note that condominium developers on the islands are demanding between 60 & 75% of the purchase price as a total down payment before their purchasers take delivery of their finished product. They also make no secret of the fact that they utilize those funds for construction costs. Veranda will require only 20% down payment and these funds will be held in an interest bearing trust account, ensuring you are protected from any unforeseen circumstances, right through the construction period.

(Id. at ¶ 10). Plaintiffs contend that a verbatim version of that brochure was created by a Playground representative and that Biker merely copied the brochure. (PRSOF at ¶ 10). Plaintiffs allege, and Defendant denies, that Mr. Kucharski advised Brown that he was doing research on the Veranda on behalf of himself, his wife, two other couples (including the Wingfields) and an individual. (Id. at ¶ 11). After returning home, Mr. Kucharski states that he spoke with Brown and Brown's boss and that they made representations that, if anything happened, the deposit was safe and that Mr. Kucharski could get it back. (PSOF at ¶ 10).

Mr. Kucharski avers that he relayed the information he had obtained about the Veranda, including the representations of Brown, to Andrew and Charlene Wingfield, as well as two other

5

couples. (PRSOF at ¶ 12). This group of individuals created a Turks and Caicos company named Grouper Properties, Ltd. ("Grouper Properties"), and Grouper Properties signed an Offer and Purchase Agreement for two units at the Veranda. (DSOPF & PRSOF at ¶ 13).[4] Mr. Kucharski alleges that the members of Grouper Properties based their decision to purchase the units on Brown's representations regarding the safety of the deposit. (PSOF Resp. ¶ 12). Each member was to own a quarter share of the two units and was responsible for one-quarter of the deposit. (PSOF & DRSOF at ¶ 13). The group members, including the Wingfields, sent their deposits via personal check to Mr. Kucharski, who then used his personal bank account to execute a series of wire transfers to Cherokee for the $204,360 deposit. (PSOF & DRSOF at ¶¶ 14 & 17). Grouper Properties never had a bank account. (Id. at ¶ 15). In 2008, the Kucharskis and Wingfields learned that they would lose their deposit because Cherokee had used their deposit for construction and gone bankrupt. (Id. at ¶ 18).

### III. Applicable Standard

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the

---

[4] The Grouper Properties Purchase Agreement is identical in all material respects to the Donachys' Purchase Agreement.

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." Id. When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983). However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial. Anderson, 477 U.S. at 252. Further, a court does not have to adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them. Scott v. Harris, 550 U.S. 373, 380 (2007). In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the nonmoving party . . . ." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions,

7

answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). The non-movant's burden is rigorous: it "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. N.J. State Police, 71 F.3d 480, 484 (3d Cir. 1995); Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009)) ("[S]peculation and conjecture may not defeat summary judgment.").

**IV. Analysis**

In order to successfully assert a NJCFA claim, a plaintiff must show three elements: (1) unlawful conduct by the defendant; (2) an ascertainable loss by plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss. See Indian Brand Farms, Inc., v. Novartis Crop Protection Inc., 617 F.3d 207, 219 (3d Cir. 2010)(quoting N.J. Citizen

Action v. Schering-Plough Corp., 367 N.J. Super. 8 (N.J. Super. Ct. App. (2007)).

   A. The Donachys

In a prior Opinion, [Docket No. 100], this Court held that of all of the alleged misrepresentations made to the Donachys, the statement that the Veranda transaction was a "secure, no-brainer" constituted mere "puffery," which is not actionable under the NJCFA. See Docket No. 100 at 15 (citing Slack v. Suburban Propane Ptnrs., L.P., No. 10-2548, 2010 WL 3810870, at *5 (D.N.J. Sept. 21, 2010) (holding that statements which said "when you shop at Suburban Propane, you get…the best value!" were not statements of fact, but non-actionable puffery)). This Court further held that "the remaining statements at issue here – statements like 'your deposit will be safe under all circumstances' or from all 'unforeseen circumstances' are not puffery." Id. at 16.

Defendant moves for summary judgment with respect to the Donachys, arguing that they did not testify as to any actionable misrepresentations made to them by Playground during sworn depositions. Instead, Defendant contends that the Donachys admit that Brown did not tell them their deposit could not be lost "under any circumstances" and that the contract documents expressly provide that the deposit could be used for construction. Defendant further contends that Plaintiffs

9

improperly refer to interrogatory responses and a new declaration in which Mr. Donachy claims Brown said the deposit would be safe "no matter what" and "under all circumstances" in order to contradict his deposition testimony.  The Defendant asks this Court to disregard Mr. Donachy's declaration as one offered only for the improper purpose of defeating summary judgment.  In sum, Defendant contends that all that remains to support the Donachys' claim are statements already deemed by this Court to be non-actionable puffery.

In response, Plaintiffs contend that they have provided sufficient evidence that Playground made actionable misrepresentations to Mr. Donachy – i.e., made statements to the effect that the deposits would be safe under all circumstances or from all unforeseen circumstances.  First, Plaintiffs point to Mr. Donachy's answers to Playground's interrogatories which state, in relevant part:  "Brown guaranteed that the deposit would be safe under 'any and all circumstances' and 'no matter what.'  He told Plaintiff several times that this was a 'secure, no-brainer' transaction and that Plaintiff worried too much." [Docket No. 116, Ex. A].  This evidence, Plaintiffs aver, is bolstered by Mr. Donachy's similar deposition testimony wherein he stated that Brown told him that the deposit "would be put into trust. It would be safe." [Docket No. 116-5, Ex. E at 63:2-3].  Mr. Donachy further testified that he understood this

10

to mean that he "couldn't lose" the deposit. [Id. at 63:14-17]. During his deposition, Mr. Donachy stated that he could not remember if Brown used those specific words "couldn't lose it" but does remember use of the word "safe." [Id. at 63:21-24]. Finally, Plaintiffs point to Mr. Donachy's declaration, which states that Brown represented that "our deposit money would be safe under 'any and all circumstances' and 'no matter what.'" [Docket No. 116, Ex. B].

With respect to Defendant's arguments regarding Mr. Donachy's declaration, this Court notes that "a sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment." Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007). This Court is, however, hesitant to deem the declaration at issue a "sham affidavit" as it is hard to characterize the affidavit as strictly "contradictory" to the prior deposition testimony. See id. at 254. In addition, "[w]hen there is independent evidence in the record to bolster an otherwise questionable affidavit, courts have generally refused to disregard the affidavit." Id. (quoting Baer v. Chase, 392 F. 3d 609, 624 (3d Cir. 2004)). Here, the contents of Mr. Donachy's declaration are corroborated by his answers to interrogatories, which were submitted prior to his deposition.

11

As such, this Court finds it need not disregard the declaration as a "sham."

Even without the disputed declaration, however, this Court finds there is sufficient evidence to deny summary judgment. First, there is competent evidence, including answers to interrogatories, that statements previously deemed "actionable" by this Court were uttered by Brown. See Pollino v. City of Philadelphia, 03-6288, 2005 U.S. Dist. LEXIS 2210, at *22-23 (D.N.J. 2005)("the Court is aware that substantive answers to interrogatories could certainly be used as "competent evidence" to defeat a summary judgment motion[.]"). As such, this Court will deny summary judgment as to the Donachys; there is sufficient evidence to create a genuine dispute of fact with respect to whether Brown made actionable representations to them beyond mere puffery.

B. The Kucharskis and Wingfields

With respect to the Kucharskis and the Wingfields, Defendant asserts the following arguments in favor of summary judgment:[5]

---

[5] In its reply brief, Defendant raises two new alternative arguments: First, even if Mrs. Kucharski and the Wingfields could prove that Browns' statements were intended to be received by them, they cannot prove the requisite causal nexus because Mr. Kucharski testified that he did not understand what Brown was talking about. Def.'s Reply Br. at 6-8. Second, the existence of the requisite causal nexus is undercut by the fact that Mr. Kucharski used a different broker to complete the

- Because Grouper Properties signed the contract and made the deposit, only Grouper Properties has standing under the NJCFA.
- The brochure containing alleged misrepresentations came from an independent agent unaffiliated with Playground.
- Suzanne Kucharski and the Wingfields never had any communications with Playground and, in the absence of any alleged misrepresentations made to them, there can be no NJFCA claim.

This Court will address these arguments in turn.

<u>Grouper Properties and Standing</u>

Defendant argues that Grouper Properties "signed the contract and made the deposit" and therefore, only Grouper Properties has standing to assert a NJCFA claim. It is undisputed that Grouper Properties signed the contract for the Veranda. Plaintiffs are correct, however, that contractual

---

Verdana transaction, which constitutes an intervening cause sufficient to destroy the needed connection between Defendant's alleged conduct and Plaintiffs' decision. <u>Id.</u> at 9-10.
    The Court notes that "[w]here a reply brief raises new arguments in support of a motion for summary judgment, the district court is justified in disregarding them." <u>Gucciardi v. Bonide Prods.</u>, No. 12-932, 2014 U.S. Dist. LEXIS 85509, at *24 (E.D. Pa. June 24, 2014). Even if this Court were to entertain these arguments, however, it would find them unpersuasive. First, the Defendant takes Mr. Kucharski's testimony out of context when it asserts that he did not understand what Brown was saying. Other testimony clearly indicates that Mr. Kucharski understood what Brown meant regarding the deposits. <u>See</u> <u>e.g.</u>, Kucharski Dep: 57:7-13 ("Q: What do you remember him saying in those initial conversation s about the financials? A: You know, he always stressed the point of the deposit monies are not going to be used for development; if anything happens, you know, you would be able to get that money back."). Second, for reasons discussed <u>infra</u>, Plaintiffs are able to demonstrate the requisite causal connection even though they used an independent agent to complete the transaction.

13

privity is not required to assert an NJCFA claim.  See Port Liberte Homeowners Ass'n Inc., v. Sodoni Const. Co., 393 N.J. Super 492, 506 (N.J. App. Div. 2007); Katz v. Schachter, 251 N.J. Super. 467, 474 (N.J. App. Div. 1991).  Instead, Plaintiffs must demonstrate: (1) unlawful conduct by the defendant; (2) an ascertainable loss by plaintiff; and (3) a causal relationship between the unlawful conduct and the ascertainable loss.  See Indian Brand Farms, Inc., 617 F.3d at 219.

This Court finds that the evidence presented in this case demonstrates that the Kucharskis and the Wingfields suffered an ascertainable loss.  "An ascertainable loss is 'a definite, certain and measurable loss, rather than one that is merely theoretical.'" Schwartz v. Avis Rent a Car Sys., LLC, No., 11-4052, 2014 U.S. Dist. LEXIS 108058, at *14 (D.N.J. Aug. 6, 2014)(quoting Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 557, 964 A.2d 741 (2009)).  It is undisputed that Grouper Properties never had a checking account and that the Wingfields sent their deposits via personal check to Mr. Kucharski, who then used his personal bank account to execute a series of wires to Cherokee for the $204,360 deposit. (PSOF & DRSOF at ¶¶ 14 & 17).  This Court finds that the funds paid directly from the Kucharskis' and Wingfields' checking accounts constitute the "definite, certain and measurable loss" required.

<u>The Brochure, Indirect Misrepresentations and Causal Nexus</u>

Defendant further contends that the brochure Mr. Kucharski relies on for his claim came from Karen Biker, an independent agent not affiliated with Playground. This argument is not persuasive as there is sufficient evidence of other alleged misrepresentations made by Brown and Brown's boss even in the absence of the brochure.[6] For example, Mr. Kucharski testified that Brown made several misrepresentations to him:

> Q: What do you remember [Brown] saying in those initial conversations about the financials?
>
> A: You know, he always stressed the point of the deposit monies are not going to be used for development; if anything happens, you know, you would be able to get that money back.
>
> \*\*\*
>
> Q: And when you say that you thought your deposit would be, you know, protected if anything happened, I understand you were basing that on what . . . Ms. Biker had said to you?
>
> A: Uh-huh.
>
> Q: What else were you basing that on?
>
> A: What Taz [Brown] had said.

---

[6] Defendant raises an argument in its reply brief that statements made by Brown's "boss" constitute inadmissible hearsay. That argument is unavailing as those statements are not being offered for the truth of the matter asserted in those statements. In addition, such statements are being offered to show the effect on the listener, Mr. Kucharski. <u>See</u> <u>Marks v. Marina</u>, 213 Fed. Appx. 147, 153 (3d Cir. Jan. 10, 2007) (finding that the court properly admitted evidence offered not for its truth, but to show the effect on the listener).

(Kucharski Dep. 57:7-13 & 66:24-67:12). Mr. Kucharski also testified that Brown's boss made statements about the deposit to him as well. Id. at 88:12-19.

While Defendant argues that there is no written documentation to corroborate that these statements were made, taking all disputed facts in a light most favorable to the non-movant, this Court finds that it is the province of a jury to determine whether the Plaintiffs' testimony is credible. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) (explaining that "it is inappropriate for a court to resolve factual disputes and to make credibility determinations" at the summary judgment stage).

In an additional argument, Defendants assert that Mrs. Kucharski and the Wingfields were not "intended recipients" of the alleged misrepresentations and that a plaintiff "must actually have heard/received the alleged misrepresentation in order to bring a claim." Def.'s Reply. Br. 1. The case law is clear, however, that the NJCFA applies to indirect misrepresentations. See Indian Brand Farms, Inc., 617 F.3d at 219 ("evidence of the kind of indirect reliance which satisfies the common law requirement would clearly satisfy the causal relationship requirement of the NJCFA."); Beth Schiffer Fine Photographic Arts, Inc. v. Colex Imaging, Inc., 10-5321, 2012 U.S. Dist. LEXIS 36695, at *40 (D.N.J. Mar. 19, 2012)("Under

16

both the NJCFA and New Jersey common law fraud, the defendant can be liable for misrepresentations that it makes indirectly to the defrauded party without the intermediary being the defendant's agent.").

Defendant additionally argues that Plaintiffs have not introduced any evidence to show that Brown knew of the other purchasers in the group before he made the representations that were allegedly passed on to the group, stating: "Kucharski admits that he didn't even get his purchasing 'group together' until after his communications with Mr. Brown had ceased." Def.'s Br. at 10 (citing Kucharski 73:16-23)("Q: During that time that that decision was being made, did you have any contact with anyone affiliated with the Veranda? A: With Taz – you know, Taz was kind of on then at that point.  It seemed to me Karen was on-island focus and Taz was not-on-island focus.  So we had a bunch of follow-up, you know, discussions . . . .").  It is unclear, however, how the deposition testimony cited by Defendant supports its assertion.

Instead, there are two pieces of evidence directly on point: first, is the declaration of Mr. Kucharski, [Docket No. 116-4 Ex. D], wherein he states, "[d]uring my phone calls with Mr. Brown in advance of deciding to make a purchase and put down deposit money, I advised him several times that I was doing research on behalf of me, my wife, two other couples and an

17

individual, all of whom would ultimately make a purchase together as a group." Second, in his deposition, Mr. Kucharski made clear that he would speak to Brown and would pass along any questions the group had onto him. Kucharski Dep. at 75:3-11. Defendant has presented no evidence to the contrary. As such, this Court finds that there is a genuine dispute of fact as to whether Brown intended that his statements be relied upon by the members of the group, and summary judgment is inappropriate. See Indian Brand Farms, Inc., 617 F.3d at 219 (denying summary judgment where there was sufficient evidence of indirect reliance on defendant's statements).[7]

Finally, there is sufficient evidence with respect to the requisite causal nexus. Unlike the case relied upon by Defendant, Chattin v. Cape May Greene Inc., 216 N.J. Super. 618 (N.J. App. Div. 1987), wherein the subsequent purchases of homes never heard or relied upon representations regarding windows installed by the defendant, there is sufficient evidence here that the alleged misrepresentations by Defendant were passed on to all Plaintiffs and that those misrepresentations formed a basis for the Plaintiffs' decision to purchase Verdana units. See Kucharski Dep. at 74:19-75:11:

---

[7] A jury may ultimately find there were no alleged misstatements passed along to the group. However, at this stage, there is sufficient evidence to create a genuine dispute of fact for a jury to resolve.

18

> Q: We were talking . . . about the roughly couple week period between the time you returned . . . from the island to you and your investment group, I'll call them, determining to purchase at the Veranda.
>
> A: Uh-huh.
>
> Q: During that time did you have ongoing discussions with the Wingfields . . . about the opportunity?
>
> A: I don't recall how many times I spoke with Taz [Brown], but it was enough to kind of clarify some outstanding questions that we had, and I would update them as to the conversations, where we were, what we would do and we made some decisions on what units to purchase.

Again, this evidence points to a nexus between the alleged misrepresentations by Brown and the Kucharski's and Wingfield's decision to purchase the Veranda units.  Therefore, summary judgment is improper.  See Indian Brand Farms, Inc., 617 F.3d at 221 (reversing grant of summary judgment on NJCFA claims as to written misrepresentations).

**V. Conclusion**

For the reasons set forth above, this Court finds that Defendant's motion for summary judgment shall be denied.  An appropriate Order will issue this date.

s/Renée Marie Bumb<br>
RENÉE MARIE BUMB<br>
United States District Judge

Dated:     August 21, 2014

19